IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAY DEE/MOLE JOINT VENTURE | * | |
| | * | |
| | * | |
| v. | * | Civil No. JFM-08-1595 |
| | * | |
| MAYOR AND CITY COUNCIL | * | |
| OF BALTIMORE, *et al.* | * | |
| | ****** | |

OPINION

Jay Dee/Mole Joint Venture ("JDM")[1] sued the Mayor and City Council of Baltimore and

the Baltimore City Department of Public Works[2] ("DPW") (collectively "the City") for damages

arising from the City's alleged breach of a public construction contract. The City counterclaimed

for breach of contract, liquidated damages, and promissory estoppel. Both JDM and the City

have moved for summary judgment on JDM's claims and on the City's counterclaims for breach

of contract and liquidated damages. Discovery has been completed, and the parties have filed

dispositive motions.[3]

I.

In October 2006, the City issued a Notice of Letting seeking bids for the Lower Stony

Run Interceptor Project ("LSR Project") as governed by Sanitary Contract No. 839R ("Contract

---

[1] JDM is a Joint Venture between Jay Dee Contractors, Inc. and Mole Constructors, Inc.

[2] The parties dispute whether the DPW as "a chartered department of the municipal corporation known as the Mayor and City Council of Baltimore . . . possess[es] the capacity to be sued" under BALTIMORE CITY CHARTER, Art. 7. Because the City does not dispute that the Mayor and City Council of Baltimore is a proper party, this issue has no meaningful bearing on the outcome of this suit and need not be addressed.

[3] JDM also moves to strike what the City labeled as "Mayor and City Council of Baltimore et al.'s Reply." JDM argues that this filing amounted to an impermissible "second chance to articulate its opposition to Plaintiff's Motion"—in violation of Local Rule 105 and the Scheduling Order—by focusing on the asserted distinction between bid contracts and performance contracts and the City's argument that the BOE did not abuse its discretion. "Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed. Local Rule 105.2(a). Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd* 112 Fed. App'x 923 (4th Cir. 2004) (citation omitted). Because my substantive analysis of this case would remain the same whether or not I considered the arguments included in what the City labels as its reply, this Motion to Strike is moot.

839R"). (Def.'s Am. Answer, Aff. Defenses, and Counter Claims ¶ 11; Pl.'s Jay Dee/Mole Joint Venture's Mot. for Summ. J. on Counts I and II of Pl.'s Compl. ("Pl.'s Mot."), Ex. 1B at NOL-1–2.) The LSR Project was to replace and construct thousands of feet of sewer lines. This work necessitated significant tunnel construction and excavation work, which required a "tunnel boring machine" ("TBM") at a rental cost of around $1 million. (Pl.'s Mot., Ex. 1B at NOL-2, CD-99–100; Mekkaoui Decl. ¶ 13.)

    a. The LSR Project and Contract 839R

Contract 839R included hundreds of pages of rules, regulations, and specifications, a few of which are particularly relevant for these motions: (*See generally* Pl.'s Mot., Ex. 1B.)

(1) Various Minority-Owned Business Enterprise and Women-Owned Business Enterprise participation requirements, including: (*Id.*, Ex. 1B at MWBE-1–2.)
    a. Assigning ten percent of the work to City-certified MBE subcontractors and another ten percent to City-certified WBE subcontractors
    b. Providing that "any unjustified failure to comply with MBE and WBE participation requirements is a material breach of contract"
    c. Requiring submission of "copies of all executed agreements with the MBE and WBE firms. . . . prior to the issuance of a notice to proceed"
    d. "The Minority and Women's Business Opportunity Office must approve substitution of an MBE or WBE specified at bid opening. Any unjustified failure to comply with this requirement is a material breach of contract."[4]
(2) As the result of a consent decree with the U.S. Environmental Protection Agency, all work necessary for sewer functionality was required to be completed by February 28, 2009 (Pl.'s Statement of Undisputed Material Facts ("SUMF") ¶ 10.) (The City eventually modified Contract 839R to push back this deadline to April 28, 2009)
(3) Obligating the contractor to "mobilize" prior to construction—that is, "furnish[] . . . all work, materials and operations required for the assembly and setting up for the project, including but not limited to": moving personnel to the project site, construction of the necessary sanitary facilities, obtaining permits, submitting plans and timetables to the engineer, etc. (Pl.'s Mot., Ex. 1B at CD-1–2.)
    a. "When the Contractor has established the necessary facilities as specified [in the mobilization requirements], fifty percent (50%) of the total bid price for [mobilization] will be payable on the first monthly estimate. The remaining

---

[4] *See also* BALTIMORE CITY CODE, ART. V, § 28-63 ("(a) Effort to substitute required. (1) If, after award of a contract, the contractor is unable to meet any contract goal by utilizing the certified business enterprises specified at bid opening, the contractor must seek a substitute certified business enterprise to fulfill its commitment. (2) The substitution must be approved by the [the Minority and Women's Business Opportunity Office].").

fifty percent (50%) of the bid price shall be pro-rated in equal monthly payments for the duration of the Contract."

(4) Obligating the contractor to undertake certain preliminary steps before commencing work on the project, such as: (*Id.*, Ex. 1B at CD–1–2, SC-36.)

    a. Mobilization (described above)

    b. Attending an orientation with city officials, generally within three days of the Notice of Award

    c. Drafting a "time-scaled network graphic" within fifteen days of the orientation

(5) Providing that "[c]osts incurred by the Contractor for insurance, bond, permit fees, royalties, security, mobilization, etc.," when properly detailed in the schedule of payments and documented to the Engineer, shall be paid in the first monthly voucher (*Id.*, Ex. 1C at §§ 10.04-8, 10.04-76(d).)

(6) Creating "just cause" for annulment of the award—and if the award is annulled providing that the contractor shall forfeit the bid bond as liquidated damages—if the contractor fails to do the following within thirty days of being awarded the contract: (*Id.*, Ex. 1B at SC-14.)

    a. Execute a formal contract

    b. Furnish the Performance Bond

    c. Provide all insurance policies (or certified copies)

On December 6, 2006, JDM submitted the lowest bid for the LSR Project at $40,856,259. The second lowest bidder was Carp Seca Corp. ("Carp Seca"). (*Id.*, Ex. 1E.) Within days, the Minority and Women's Business Opportunity Office ("MWBOO") determined that JDM's bid complied with the Minority-Owned Business Enterprise ("MBE") and Women-Owned Business Enterprise ("WBE") (collectively "M/WBE") participation requirements. (*Id.*, Ex. 5E.)

Along with its bid, JDM deposited a $817,125 bond (two percent of its bid). According to a document entitled "Bid Bond" ("Bid Bond Document"), signed by JDM on November 29, 2006, the bond was to be returned to JDM under two sets of circumstances: (1) if JDM's bid was rejected, or (2) if JDM's bid was accepted and JDM "execute[d] and deliver[ed] a Contract . . . (properly completed in accordance with said Bid), and . . . furnish[ed] a bond for [its] faithful performance of said Contract . . . and . . . in all other respects perform[ed] the Agreement created by the acceptance of said bid." (Def.'s Response to Pl.'s Mot. for Summ. J. and Def.'s Cross Mot. for Summ. J. ("Def.'s Mot."), Ex. 7 at BB–1–2.)

JDM submitted dozens of pages detailing its bid. JDM enclosed Statements of Intent between JDM and the M/WBEs—including K-O Construction, Inc. ("K-O") and R&R Utility Contractors, Inc. ("R&R")—with whom it had agreed to subcontract to comply with Contract 839R's M/WBE requirements. JDM represented that its subcontract with K-O would satisfy over ninety-five percent of the MBE requirement and that its subcontract with R&R would satisfy over ninety percent of the WBE requirement. All Statements of Intent required both JDM and the subcontractor to attest that they "agree[d] to enter into a contract for the work/service indicated above for the dollar amount or percentage indicated . . . ." The K-O Statement of Intent indicated that it would provide "drainage structures" and "sewer construction" at a cost of $3,898,646. The R&R Statement of Intent indicated that it would provide "sitework and utilities" at a cost of $3,718,625.90. Notably, the "Materials/Supplies to be furnished by MBE or WBE" section of R&R's Statement of Intent was left blank. (*See id.*, Ex. 7 at MWBE-6–8.)

Within weeks of the bids being submitted, Carp Seca filed a Bid Protest with the City Board of Estimates[5] ("BOE"), which was eventually rejected on March 28, 2007. (*See* Pl.'s Compl. ¶ 17.) Also on March 28, the BOE voted to award Contract 839R to JDM. The DPW notified JDM of the award in a letter which read in part:

> Notice to Proceed will be issued within thirty (30) days of the award contingent upon receipt of executed agreement, M/WBE subcontract agreements, proof of insurance, and bonds as required by the special provisions of the specifications and upon our approval of such documents.
>
> Failure to comply with these requirements within thirty (30) days after the award shall be just cause for the annulment of the award.

(Pl.'s Mot., Ex. 1H.) Pursuant to this award letter, JDM provided the City with executed copies of Contract 839R, performance bond, and Proof of Insurance. (*See id.*, Ex. 7A, Ex. 7B.)

b. The M/WBE Subcontract Negotiations

---

[5] The BOE consists of the Mayor, the President of the City Council, the Comptroller, the City Solicitor, and the Director of Public Works.

After securing the contract award, JDM immediately moved to finalize subcontracts with both R&R and K-O. By way of background, on November 28, 2006, R&R had submitted a proposal to perform "sitework and utilities on a time and material basis only" ("T&M Proposal"), which served as the basis for the Statement of Intent. (*See* Pl.'s Mot., Ex. 3A, Ex. 3N.) This proposal listed various hourly wages for R&R employees and mentioned "[m]aterial and equipment provided at cost plus," but did not refer to a TBM or any other specific materials or equipment. (*Id.*, Ex. 3A.) R&R alleges that it understood this proposal—based on its language and other communication with JDM—to cover "the purchase of materials that are *incidental* to our work. . . . around $500,000 for incidental materials to our labor, marked up by 20%." (*Id.*, Ex. 3N (emphasis added).) That is, R&R asserts that it envisioned a contract primarily for labor. The City points out that R&R was not even City-certified to use a TBM machine, which would have required R&R or its personnel to have prior experience working on at least six TBM excavations. (*See* Def.'s Mot., Ex. 8.) JDM, on the other hand, alleges that the T&M Proposal, and other communication between R&R and JDM, indicated that R&R would provide whatever materials and equipment were necessary for the "sitework and utilities."

Shortly after JDM submitted its bid, it became clear that JDM and R&R had significant disagreements about the subcontract. Between December 6 and December 14, 2006, R&R alleges that A.G. Mekkaoui, JDM's project manager, contacted R&R in an effort to renegotiate the labor rates. On December 14, 2006, Mekkaoui faxed R&R a letter in which he asserted that R&R had misunderstood his previous communication and that he was not in fact attempting to renegotiate the labor rates. However, when Mekkaoui met with Jennifer DiPietro, President of R&R, on December 20, DiPietro alleges that Mekkaoui again tried to convince her to reduce the rates. (*Id.*, Ex. 12 ¶¶ 10–12.)

JDM continued to struggle to finalize subcontracts with K-O and R&R after it was officially awarded Contract 839R on March 28. Between April 16 and May 11, JDM extended three subcontract proposals to R&R:

- April 16: $3.7 million tunnel excavation subcontract calling for $3.2 million in materials and equipment, including up to $1 million to rent a TBM, and 9,460 man hours
- April 26: $3.7 million "sewer and shaft construction" subcontract calling for 21,120 man hours plus materials and equipment, not including a TBM, estimated by the City to amount to over 82 percent of the subcontract value
- May 10: $3.7 million "sewer and shaft construction" subcontract calling for 40,000 man hours plus materials and equipment, not including a TBM, estimated by the City and R&R to amount around fifty percent of the subcontract value

(*See* Pl.'s Mot., Ex. 3B, Ex. 3E, Ex. 3G, Ex. 3M; Def. Mem. at 25.) R&R rejected all three proposals, asserting that it was entitled to a subcontract with no more than twenty-five percent of the value in materials and equipment. (*See* Pl.'s Mot., Ex. 3I, 3L.)

Frustrated with K-O and R&R, JDM contacted potential replacement M/WBEs and started negotiating replacement subcontracts. (*See* Mekkaoui Decl. ¶ 9–14.) On May 4, 2007, JDM contacted the City and sought to substitute these replacement M/WBEs for R&R and K-O. In response, Thomas Corey, Chief of the MWBOO, instructed an MWBOO employee, Eng Peng, to contact both K-O and R&R. Ms. Peng spoke with DiPietro who said that R&R refused to agree to the subcontract because JDM was insisting that R&R provide a TBM as part of the contract and doing so would make R&R merely an "illegal pass through."[6] (Pl.'s Mot., Ex. 5I.) Ms. Peng also spoke with representatives of K-O, who complained that JDM refused to execute a subcontract under the terms contemplated in November of 2006. K-O alleged that JDM was

---

[6] A "pass through" refers to a subcontract that merely passes through equipment or materials to the project. That is, when a large portion of the subcontract price is devoted to acquiring materials or equipment, that subcontract merely passes necessary materials and equipment through a subcontractor. A "pass through" can undermine the goals of the M/WBE requirements by denying any meaningful business opportunity to an M/WBE.

trying to "renegotiate key terms" and was shopping the subcontract around to other MBEs. (Def.'s Mot., Ex. 8 at 2.)

On May 6, 2007, just two days after JDM's initial request for substitution, the MWBOO faxed JDM a letter announcing its denial of the request. The letter explained that JDM's reasons for substitution, and K-O's and R&R's reason for refusing to sign the subcontracts, did not justify substitution. The letter also effectively extended the deadline for submission of the M/WBE subcontracts to May 11. (*See* Pl.'s Mot., Ex. 5K.) Corey later explained the rationale for this denial in more detail. The MWBOO only approves substitution in certain circumstances, such as if the subcontractor becomes unavailable to perform, the subcontractor unreasonably refuses to execute, or the City changes the scope of the work required. (*Id.*, Ex. 10B ¶ 70.) The MWBOO confines substitution to these and similar circumstances in an effort to ensure that the Statements of Intent reflect an actual meeting of the minds that the City can rely on, and to avoid contractors submitting Statements of Intent that they intend to renegotiate or shop around to other M/WBEs after receiving the award. (*See id.*, Ex. 10A at 53–54.) Corey did not believe that any of the circumstances justifying substitution existed in this case. First, he understood both the April 16 and April 26 subcontract proposals as requiring JDM to provide a TBM. (*Id.*, Ex. 10A at 63, 84–86.) Second, he had been in close contact with DiPietro throughout the negotiation process and understood, from her and from documents she provided to him, that JDM had attempted to change the scope and terms of their agreement. (*See id.*, Ex. 10A at 62; Def. Mot., Ex. 12 ¶ 33.) Third, Corey concluded that JDM never actually reached agreements with R&R and K-O as it had represented in its Statements of Intent and therefore Corey considered JDM's bid to have been submitted in bad faith. (Pl.'s Mot., Ex. 6F at 2424–26.)

On May 11, 2007, JDM finally reached an agreement with K-O, which they formally

executed on June 4. Also on May 11, JDM sent Corey a letter explaining its inability to reach an

agreement with R&R and renewing its request for substitution. On May 16, Corey notified DPW

that JDM was in noncompliance with the M/WBE requirements under Article 5, Subtitle 28 of

Baltimore City Code for its inability to finalize agreements with either K-O or R&R (the K-O

deal had not yet been executed at this point). Corey explained that "we are satisfied that JDM's

covenant to comply with the City's MBE ordinance was not submitted in good faith." (*See id.*,

Ex. 5M, Ex. 5N.)

On May 18, 2007, DPW representatives informed JDM that it was recommending award

annulment because JDM failed to finalize all the M/WBE subcontracts within thirty days of the

award letter as required by SC-8 in Contract 839R. (*See* DiPonio Decl. ¶ 9.) In response, between

May 23 and June 12, JDM sent multiple letters to the City arguing that SC-8 did not in fact

require finalized M/WBE subcontracts within thirty days.[7] (SUMF ¶ 68.)

   c.   JDM's Pre-Construction Activities

As these subcontract negotiations were occurring, JDM also "commenced pre-

construction work activities . . . includ[ing] pre-construction meetings, preparation of the detailed

construction schedule, construction planning, submittals, training, subcontracting and various

mobilization activities. . . ." (*Id.* ¶ 16.) Although JDM's post-award construction schedule did

not appear to contemplate any work until the Notice to Proceed was issued (*see* Def.'s Mot., Ex.

6), JDM alleges this mobilization and pre-construction work was necessary in part because of the

pressing deadline imposed by the EPA Consent Decree. (SUMF ¶ 8.) However, the DPW sent

multiple communications to JDM reminding it to wait until the Notice to Proceed is issued

---

[7] On June 7, 2007, Carp Seca notified the City that it had already negotiated most of the necessary M/WBE
subcontracts, even though it had not been awarded Contract 839R, and was prepared to perform. Carp Seca had even
negotiated subcontracts with both K-O and R&R. (*See* Pl.'s Mot., Ex. 5P.)

before beginning work, including a May 7 email that read in part: "As per our conversation this morning on site . . . . You are working without a Notice to Proceed, we [sic] directing you to stop all work until the official Notice to Proceed is issued." (*See* Def.'s Mot., Ex. 5.)

    d.  <u>Annulment and Its Fallout</u>

Finally, on June 20, 2007, the BOE met to discuss annulling the contract award. Corey, testifying at the meeting, articulated three overlapping reasons for annulment. First, JDM's bid was submitted in bad faith—that is, JDM knew it had not reached a meaningful agreement with either K-O or R&R at the time of its bid submission—thereby undermining the integrity of both the competitive bidding process and the City's M/WBE laws. Corey concluded:

> that perhaps a number in [sic] the scope of work was submitted is [sic] purely for the purpose of getting the contract and then afterwards going out and trying to find a better deal. Or what is common with the MBE and the WBEs with the prime contractors is trying to get them down in price. That is something we don't condone.

Second, Corey explained that all of JDM's subcontract proposals to R&R demanded around $3 million, the overwhelming majority of the subcontract price, for renting a TBM or providing other equipment. (This explanation was inaccurate: JDM's first two proposals required R&R to provide around $3 million in materials and equipment, but JDM's third proposal only required R&R to provide around $2 million in materials and equipment.) Third, Corey stated that he was troubled by what he believed was JDM dictating R&R's mark-up on the rental equipment under the subcontract. (*See* Pl.'s Mot., Ex. 6F at 2424–26.)

After Corey's testimony, the City Solicitor moved to annul the award, explaining that he was concerned that the M/WBE requirements had not been met and that he had confidence in Corey's investigation and analysis. The BOE subsequently voted to annul. (*See id.*, Ex. 6F, Ex. 6H.)

On June 18, 2008, JDM filed suit[8] alleging four counts against the City: (1) Breach of Contract/Failure to Pay (at least $646,588.77 in pre-construction costs), (2) Breach of Contract/Wrongful Termination, (3) Quantum Meruit, and (4) Unjust Enrichment. The City subsequently filed three counterclaims against JDM: (1) Breach of Contract, (2) Breach of Contract/Liquidated Damages (amounting to $817,125.18), and (3) Promissory Estoppel.

In March of 2009, the City moved to dismiss JDM's Counts III and IV (quantum meruit and promissory estoppel) in part "because an express written contract governs the subject matter of these counts." (Mayor and City Council of Baltimore's Partial Mot. to Dismiss at 2.) JDM consented to dismissal on the condition that the City "acknowledge[] . . . the existence/formation of an express, written and binding contract . . . ." JDM also asserted its "position that as a matter of law and equity Defendants' are estopped from subsequently taking a position inconsistent or contrary with the City's repeated acknowledgement of the existence of an express, written and binding contract." (Pl. JDM's Consent to Def.'s Partial Mot. to Dismiss at 1–2.) I then dismissed Counts III and IV "provided . . . that [the City] may file a motion to rescind this order on or before April 22, 2009 if they do not consent to the conditions that plaintiff has imposed upon his consent . . . ." (Doc. # 28.) No such motion was ever filed.

## II.

The parties agree that this Court has diversity jurisdiction over this suit under to 28 U.S.C. § 1332 and that Maryland substantive law governs. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Alpha Constr. and Eng'g Corp. v. Ins. Co. of State of Pennsylvania*, 601 F. Supp. 2d 684, 688 (D. Md. 2009). A genuine issue exists "if the evidence is

---

[8] Previously, on June 16, 2008, JDM submitted a Claim Statement of Details with the City, asserting that it was entitled to $5,348,330.97: $467,863.99 for pre-termination contract costs, $70,959.98 for post-termination costs, and $4,809,507.00 for unrealized profits. (Pl.'s Compl. ¶ 39.) The City refused to pay JDM. (SUMF ¶ 76.)

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 77 U.S. 242, 248 (1986). "When cross-motions for summary judgment are submitted to a district court, each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Alpha Constr.*, 601 F. Supp. 2d at 688 (internal marks omitted) (quoting *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir.2003)).

III.

In Count I, JDM has sued for breach of contract "to recover payment due for work performed prior to termination of the Contract, including pre-construction activities to assemble, set-up and prepare for the start of the Project work." The outcome of this claim, like most of the parties' claims, hinges primarily on two questions: (1) whether the parties agreed to Contract 839R, and (2) whether the City abused its discretion in denying JDM's request to substitute a different WBE for R&R. Although Contract 839R was formed, because the City acted within its discretion in denying JDM's substitution request, JDM materially breached Contract 839R by failing to finalize the required WBE subcontract with R&R. Consequently, JDM is not entitled to damages under a breach of contract theory and summary judgment on Count I will be granted in favor of the City.

    a.  <u>Contract 839R was Formed on March 28, 2007</u>

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank N.A.*, 776 A.2d 645, 651 (Md. 2001). A contract "must rest finally upon an offer made by one party and the acceptance thereof by the other party . . . . The offer must be certain and definite, and the acceptance must in every respect meet and correspond with the

offer." *Buffalo Pressed Steel Co. v. Kirwan*, 113 A. 628, 630 (Md. 1921). Maryland law interprets offers and acceptances objectively: "what a reasonable person in the position of the parties would have thought [they] meant." *Nat'l Fire Ins. Co. of Hartford v. Tongue, Brooks & Co., Inc.*, 486 A.2d 212, 216 (Md. 1985) (quoting *Ray v. Eurice*, 93 A.2d 272 (Md. 1952)) (internal marks and other citations omitted); *see also Beckenheimer's, Inc. v. Alameda Assoc. Ltd. P'ship*, 611 A.2d 105, 110 (Md. 1992).

Under the City's procurement laws, public contracts worth more than $25,000 must be awarded through a competitive bidding process. *See* BALTIMORE CITY CHARTER, Art. VI, § 11(b). The law governing public contract formation through a bidding process is informed by basic contract law principles. To begin with, "[a]n invitation to bid on a public contract is not an offer to contract but a solicitation for an offer. The contractor's bid is the offer to contract." *Hadaller v. Port of Chehalis*, 986 P.2d 836, 839 (Wash. Ct. App. 1999) (internal citations omitted) (interpreting Washington law); *accord Stark Elec. v. Huntington Hous. Auth.*, 375 S.E.2d 772, 774 (W.Va. 1988) (interpreting West Virginia law); *cf. Am. Lighting Co. of Baltimore City v. McCuen*, 48 A. 352, 353–54 (Md. 1901) (interpreting Maryland law). "Award of a competitively bid contract normally is made by (1) acceptance of the low responsive bid from a responsible bidder and (2) communication of the acceptance by an authorized person to the low bidder during the 'firm bid' period." BRUNER & O'CONNOR ON CONSTRUCTION LAW § 2:139; *see also Am. Lighting*, 48 A. at 353–54 ("When the board of awards . . . actually awarded the contract to the plaintiff. . . . the contract was . . . complete and legally binding . . . . The minds of the parties met, and nothing remained to be done but to prepare and execute the more formal contract as provided by the charter. Such being the situation, it is well settled, both

upon general principle and authority, that the contract is complete."); *Ne. Mississippi Cmty. College Dist. v. Vanderheyden Constr. Co.*, 800 F. Supp 1400, 1402 (N.D. Miss. 1992) (interpreting non-Maryland law) (quoting *City of Susanville v. Lee C. Hess Co.*, 290 P.2d 520 (Cal. 1955); *Gurtler, Hebert & Co. v. Orleans Parish School Bd.*, 251 So.2d 51, 53–54 (La. App. 1971)).

On March 28, 2007, the City bound itself to the terms of Contract 839R.[9] Whether it was through the BOE contract award vote or the award letter from DPW, or both, the City (1)

---

[9] The City notes that its procurement laws require performance contracts to be in writing and executed by a proper City official, and argues that Contract 839R cannot bind the City because the proper City official(s) never signed it. *See* BALTIMORE CITY CHARTER, Art. VI, § 11(g)(3)(i), Art. VII, § 2(b). Jurisdictions are split as to whether a "statute expressly requiring or clearly intimating that public contracts must be put into writing operates to support a holding that the award of a contract to a bidder does not by itself create a binding obligation, with the result that the governmental subdivision . . . has power to revoke the award prior to the time a formal contract is executed." J.D. Emerich, *Revocation, Prior to Execution of Formal Written Contract, of Vote or Decision of Public Body Awarding Contract to Bidder*, 3 A.L.R.3d 864 §§ 1, 2 (1965). In Maryland, however, a law requiring public contracts to be executed by a City official does not necessarily preclude the creation of a binding contract prior to the formal execution of the written instrument. *See Cohen v. Baltimore County*, 185 A.2d 185, 188 (Md. 1962) (where there was no other clear "mandate, either in the code or Charter, requiring the execution of a formal contract," holding that a Baltimore County Charter provision requiring the county executive to sign all contracts did not preclude enforceability before the contract was formally executed because the executive's signature was merely a "ministerial function" (citations omitted)); *Am. Lighting Co.*, 48 A. 353–54 ("When the board of awards . . . awarded the contract to the plaintiff. . . . the contract was complete and legally binding as if the more formal contract provided for by section 15 of the charter had been executed."). As in *Cohen*, the Baltimore City Charter's mandate that City contracts be executed by a proper City official does not preclude Contract 839R from binding the City.

The City also argues that the City Solicitor's failure to sign Contract 839R renders it unenforceable because the Baltimore City Charter requires all contracts "be submitted to the City Solicitor and have endorsed upon them the City Solicitor's opinion as to their legal sufficiency." *See* BALTIMORE CITY CHARTER, Art. VII, § 24(b). At least one court has suggested that no contract can bind the City unless it is signed by the City Solicitor. In *Chesapeake Outdoor Enterprises, Inc. v. Mayor and City Council of Baltimore*, the court distinguished an older version of what is now Section 24(b) from the signature requirement in *Cohen*. 597 A.2d 503, 507–08, n.8 (Md. Ct. Spec. App. 1991). The court was "reluctant" to find the City Solicitor signature requirement to be purely "ministerial" because "[t]he purpose of the endorsement requirement is to obtain a trained legal opinion on legal instruments involving the interests of the City . . . ." *Id.* In the end, however, the court did not need to decide the issue. *Id.*

I do not believe Section 24(b) requires the City Solicitor's signature for a contract to bind the City. First, no language in Section 24(b) expressly precludes contract enforceability in the absence of the City Solicitor's signature. Second, Section 24(b) appears not in the procurement-specific section of the charter, but in the description of the Department of Law's responsibilities in the "Executive Departments" article of the charter. Accordingly, Section 24(b)'s purpose seems to be more about directing the City Solicitor to analyze the legal sufficiency of contract documents, and less about precluding the enforceability of an otherwise agreed-upon contract until after the City Solicitor's signature has been affixed. Finally, I am reluctant to hold that a BOE award decision—which would otherwise amount to a contract acceptance by a body composed of the highest ranking City officials, including the City Solicitor—has *no* legal force until the City Solicitor has analyzed the legal sufficiency of and endorsed the post-award documents submitted by the bidder. Such a system would be in some tension with the concept, implicit in *Cohen* and *American Lighting*, that a municipal body charged with awarding contracts generally possesses the authority to bind the City to a contract absent an express statutory directive limiting that authority.

accepted JDM's low responsive bid and (2) communicated that acceptance, through an

authorized person, to JDM. *See* BRUNER & O'CONNOR, *supra*, § 2:139. That is, the City accepted

JDM's offer to enter into Contract 839R.[10]

The parties dispute whether this performance contract formed on March 28 required JDM

to submit the executed M/WBE requirements within thirty days of award notice.[11] JDM points

out that Contract 839R did not expressly include such a requirement: SC-8 required the

successful bidder to formally execute the contract and provide other documentation within thirty

days, but said nothing about the timeline for submitting M/WBE subcontracts. Accordingly,

JDM argues, the thirty day deadline, expressly required in the award letter, was a new term not

---

[10] Although there does not appear to be Maryland case law on point, many jurisdictions have held that where bid acceptance is expressly conditioned on certain requirements, "acceptance is conditional and non-binding until all [those] conditions are satisfied." BRUNER & O'CONNOR, *supra*, at § 2:139; *see, e.g.*, *Dick Fischer Dev. No. 2, Inc. v. Dep't of Admin.*, 778 P.2d 1153, 1155 (Alaska 1989); *Delta Democrat Publ'g Co. v. Bd. of Public Contracts*, 81 So.2d 715, 854 (Miss. 1955); *Istari Constr., Inc. v. City of Muscatine*, 330 N.W.2d 798, 800 (Iowa 1983); *Stark Elec.*, 375 S.E.2d at 773–75; *cf.* J.D. Emerich, *supra*, §§ 1, 3 ("[T]he cases hold with fair consistency that if a resolution or communication awarding a contract is conditioned on the later execution of a written contract, the award may be revoked before the later event occurs."). In this case, however, the award letter included unconditional acceptance, and it therefore immediately bound the City to Contract 839R and did *not* create any conditions precedent to contract formation. The relevant portion of the letter read: "Notice to Proceed will be issued within thirty (30) days of the award contingent upon receipt of executed agreements, M/WBE subcontract agreements . . . . Failure to comply with these requirements within thirty (30) days after the award shall be just cause for the annulment . . . ." (Pl.'s Mot., Ex. 1H.) Although this language purported to create a condition for issuance of the Notice to Proceed, and threatened annulment if certain conditions were not met, it did not include any prerequisites to actual contract formation. As a result, the language is distinguishable from the type of express, unequivocal statements that create conditional acceptances. *See, e.g.*, *Stark Elec.*, 375 S.E.2d at 773–75 (award granted "subject to HUD approval"). *Dick Fischer Dev. No. 2*, 778 P.2d at 1155 (acceptance was "final notice of award of contract(s) . . . if no appeal of the award(s) . . . is received . . . .").

    Some courts have also suggested that conditions included in an award notice may amount to conditions precedent to contract *performance*, even if that award notice also served as an acceptance of the bidder's offer. *See Hadaller*, 986 P.2d at 840 (emphasis added) (interpreting Washington law); *K.L. Conwell Corp. v. City of Albuquerque*, 802 P.2d 634, 636–39 (N.M. 1990) (interpreting New Mexico law). However, permitting an award notice to both form a binding contract and add a condition precedent to performance is in tension with the Maryland rule that an acceptance may not add new terms to a contract. *Cf. David A. Bramble, Inc. v. Thomas*, 914 A.2d 136, 146 (Md. 2007) ("Maryland requires generally the literal matching of terms in cases involving the formation of binding contracts . . . ."); *Ebline v. Campbell*, 121 A.2d 828, 831 (Md. 1956) ("Qualified or conditional acceptances are counter-offers and reject the original offer." (quoting WILLISTON ON CONTRACTS, Vol. 1, § 77)); *Norkunas v. Cochran*, 895 A.2d 1101, 1110 (Md. Ct. Spec. App. 2006) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer.")).

[11] Although the City disputes that a performance contract was formed, it asserts that whatever contract was agreed to on March 28 required JDM to submit executed M/WBE subcontracts within thirty days of award notice.

properly part of the contract.[12] Regardless of whether this specific thirty day deadline bound JDM, however, Contract 839R implicitly required JDM to provide the City with all of the executed M/WBE subcontracts within a reasonable time after the contract award, and there is no genuine dispute that JDM was unable to do so. (*See* Pl.'s Mot., Ex. 1B at MWBE-1–2 (requiring submission of "copies of all executed agreements with the MBE and WBE firms. . . . prior to the issuance of a notice to proceed").) JDM and R&R were at an impasse because of a fundamental disagreement about the terms of the subcontract; they would have been unable reach an agreement even without a thirty day deadline. As a result, I need not decide whether that deadline bound JDM; either way, JDM failed to furnish the City with the M/WBE subcontracts as required by Contract 839R.

  b. <u>JDM Materially Breached Contract 839R</u>

   Because JDM was unable to agree to a subcontract with R&R, and the City did not abuse its discretion in denying JDM's request for substitution, JDM materially breached Contract 839R by failing to comply with its M/WBE requirements.

   Although any breach of contract may give rise to a cause of action for damages, RESTATEMENT (SECOND) OF CONTRACTS § 236 cmt. a., only a material breach discharges the non-breaching party of its duty to perform. 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.); *see Final Analysis Comm'c Serv. v. Gen Dynamics Corp.*, 253 Fed. App'x 307, 313 (4th Cir. 2007) (unpublished) (citing *Rogers Refrigeration Co., Inc. v. Pulliam's Garage, Inc.*, 505 A.2d 878, 883 (Md. Ct. Spec. App. 1986); *Fromm Sales Co. v. Troy Sunshade Co.*, 159 A.2d 860, 863 (1960)). Under Maryland law, "[a] breach is material 'if it affects the purpose of the contract in an important or vital way.'" *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th

---

[12] JDM notes, and the City does not deny, that after Contract 839R was annulled, the City amended its boilerplate version of SC-8 to expressly include a thirty day deadline for furnishing all of the M/WBE subcontracts. It may be inferred from the timing that this change was made to avoid the type of confusion that occurred in this case.

Cir. 2005) (quoting *Sachs v. Regal Sav. Bank, FSB*, 705 A.2d 1, 4 (Md. Ct. Spec. App. 1999)). Additionally, although I was unable to find Maryland case law expressly so holding, it is literally "hornbook law" that "[w]here the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision." 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.) (citing *Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 495 A.2d 66 (N.J. 1985)).

Contract 839R provided that "any unjustified failure to comply with MBE and WBE participation requirements is a material breach of contract." (*See* Pl.'s Mot, Ex. 1B at MWBE-1– 2.) As discussed above, there is no genuine dispute that JDM and R&R were at an impasse and unable to reach an agreement. JDM therefore failed to comply with the WBE participation requirements under any reasonable interpretation of Contract 839R. Moreover, this failure was not "justified." Although R&R's T&M Proposal provided that "material and equipment [would be] provided at cost plus", the focus of the proposal was hourly wage rates and it never suggested that materials or equipment would amount to anything approaching the majority of the subcontract value. In fact, the R&R Statement of Intent submitted with JDM's bid included nothing in the section entitled "Materials/Supplies to be furnished by MBE or WBE." Comparing these details, of the T&M Proposal and the Statement of Intent, to JDM's demands that R&R provide fifty to ninety percent of the subcontract value in materials and equipment makes clear that JDM's failure to comply with the WBE requirements was a problem of its own making. At the very least, JDM failed to reach a meaningful agreement with R&R prior to submitting its bid; at worst, JDM tried to strong-arm R&R into accepting new subcontract terms after JDM possessed the leverage of having secured the contract award.

Because of its unjustified failure to comply with the WBE requirement via subcontracting with R&R, JDM found itself in material breach of Contract 839R *unless* it could substitute a different WBE in R&R's place. As a result, the question becomes whether the City abused its discretion in denying that substitution request.[13] As an initial matter, I must note my concern about the City's M/WBE requirements and compliance process. By demanding that prime contractors hire M/WBE subcontractors—who are likely to be repeat players familiar with City officials—and generally refusing to allow post-contract award substitution, the City gives M/WBEs extraordinary bargaining power in negotiating their subcontracts. Prime contractors unable to finalize these subcontracts may find themselves at the whim of unelected bureaucrats—who may have preexisting relationships with the M/WBE(s) involved, yet possess the *de facto* power to scuttle contracts often worth millions of dollars—at the MWBOO. This system is particularly troubling considering that the M/WBE requirements were presumably originally introduced, in part, to facilitate the entry of previously excluded companies into the City subcontracting business. Today, however, the system risks creating the opposite effect: helping well-connected subcontractors access a piece of the City contracting pie under favorable terms.

Unfortunately, the MWBOO's conduct in this case illustrates some of my concerns. Despite a $40 million contract at stake, the MWBOO took only two days to investigate the dispute between JDM and R&R before denying the substitution request. Moreover, the conclusions the MWBOO reached were primarily based on communications with R&R, who

---

[13] JDM argues the following contract language, and a similar statutory directive, required the MWBOO to approve its substitution request: "The [MWBOO] must approve substitution of an MBE or WBE specified at bid opening. Any unjustified failure to comply with this requirement is a material breach of contract."  I disagree. If the MWBOO was required to approve all substitution requests, seeking MWBOO approval would be pointless. Accordingly, I believe this contract language is *not* synonymous with "the MWBOO is required to approve all substitution requests," but instead means "contractors must obtain approval for any substitution from the MWBOO."

Corey—the head of the MWBOO—admittedly trusted as a result of his longstanding working relationship with that company.

All that said, in this particular case, no reasonable trier of fact could find that the City abused its discretion. Although Corey was mistaken about some of the circumstances surrounding the JDM-R&R negotiations, Corey and the MWBOO nonetheless had legitimate reasons for denying substitution. As described above, JDM had demanded subcontract terms—requiring R&R to provide large amounts of materials and equipment—which R&R never contemplated or agreed to at the time the Statement of Intent was filed with JDM's bid. One of two inferences must be drawn from that action: either JDM lacked an actual, meaningful agreement with R&R at the time the Statement of Intent was filed (because JDM understood the "agreement" to mean one thing and R&R reasonably understood it to mean something materially different), or JDM and R&R did reach an agreement but JDM later used its leverage as the contract awardee to try to strong-arm R&R into accepting new terms. Either way, the City's decision was within its discretion. If the City's denial was based on JDM's failure to reach a pre-bid submission agreement, that decision furthered the City's legitimate interest in preventing prime contractors from submitting Statements of Intent in the absence of an actual agreement with the M/WBE. If the City's denial was based on JDM's efforts to pressure R&R into accepting new contract terms, that decision furthered the City's legitimate interest in preventing prime contractors from bullying M/WBEs into accepting less favorable subcontract terms.

In sum, because JDM failed to finalize a subcontract with R&R, and the MWBOO's refusal to permit substitution was not an abuse of discretion, JDM materially breached Contract 839R.[14]

---

[14] The City also argues that it is shielded from liability for breach of Contract 839R under Maryland's doctrine of sovereign immunity. This argument is without merit. Under Maryland law, state and municipal governments are

c.   JDM's Material Breach Precludes Recovery for the City's Failure to Pay

Given that JDM materially breached, there remains the question of whether JDM is

nevertheless entitled to payment for the work it performed after Contract 839R was formed but

before it was terminated. Again, a material breach discharges the non-breaching party of its duty

to perform. *See Final Analysis Comm'c*, 253 Fed. App'x at 313 (unpublished) (citations

omitted); 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.). "[A] party who has materially breached

a contract is not entitled to recover damages for the other party's subsequent nonperformance . . .

since the latter party's performance is excused." 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.);

*see also Hubler Rentals, Inc. v. Roadway Express*, 637 F.2d 257, 260–61 (4th Cir. 1981)

(holding that plaintiff could not recover for defendant's contract termination, even though

termination was pursued in a manner that violated the termination process prescribed by the

contract, because plaintiff had previously materially breached and "[t]he fact of breach was all

that the Maryland rule requires to bar [plaintiff] from recovering damages for breach of

contract"); *Collins/Snoops Assoc., Inc v. CJF, LLC*, 988 A.2d 49, 57 (Md. Ct. Spec. App. 2010)

("On a claim for breach of contract, the plaintiff (or counterplaintiff) asserting the claim for

damages bears the burden of proving all elements of the cause of action, including plaintiff's own

performance of all material contractual obligations.").

---

immune from some tort lawsuits under the common law doctrine of sovereign immunity. *Mayor and City Council of Baltimore v. Whalen*, 909 A.2d 683, 688–89 (Md. 2006). As the City points out, MD. ANN. CODE art. 23A, § 1A— which purports to waive immunity for "municipal corporations" for "written contract[s] executed . . . by an official or employee acting within the scope of his authority"—implies that the City is immune from a breach of contract suit unless the contract is in writing and properly executed. This statutory language, however, was premised on a misunderstanding of common law: when it passed Section 1A, the Maryland legislature did not realize that the "immunity from contract actions enjoyed by the State did not apply to the counties and municipalities . . . ." *See Baltimore County v. RTKL Assoc., Inc.*, 846 A.2d 433, 436 (Md. 2004) (addressing MD. ANN. CODE art. 25A, § 1A, which was passed at the same time as Article 23A and is virtually identical to Article 23A but for the fact it applies to chartered counties instead of incorporated municipalities). Under this mistaken belief, "the Legislature proceeded, subject to certain conditions and limitations, to waive the immunity it knew was enjoyed by the State and the immunity it apparently thought was enjoyed by the counties and municipalities . . . ." *Id.* In short, Section 1A's waiver is entirely unnecessary; in actuality, "Maryland law has never recognized the defense of governmental immunity in contract actions against counties and municipalities." *See id.* (quoting *Montgomery County v. Revere*, 671 A.2d 1, 10 (Md. 1996) (internal marks and other citations omitted)).

The parties dispute both the nature of the work JDM was expected to complete prior to issuance of a Notice to Proceed and the extent of the work JDM actually completed prior to termination. Regardless, the City's obligation to perform—that is, its obligation to pay—was discharged when, in May 2007, JDM reached an impasse in the subcontract negotiations with R&R, thereby materially breaching Contract 839R by running afoul of the WBE requirements. *See supra* Section III.b. Because JDM does not allege the City failed to pay or otherwise breached before May 2007, JDM materially breached first and it cannot recover for the City's subsequent non-performance.

## IV.

In Count II, JDM alleges that the City is liable for breach of contract for wrongfully terminating Contract 839R. Because JDM materially breached Contract 839R prior to the City terminating, *see supra* Section III, the City acted within its legal rights and summary judgment will be granted in the City's favor. *See e.g.*, 23 WILLISTON ON CONTRACTS § 63:3 (4th ed.) (noting that a material breach discharges the non-breaching party of its duty to perform).

I reject JDM's argument that the BOE's annulment decision—that is, the City's termination—should be invalidated under the *Accardi* Doctrine because the MWBOO failed to follow three requirements under BALTIMORE CITY CODE, ART. V, § 28-87 (M/WBE requirements): (1) notifying the contractor if it "finds cause to believe that [the] contractor . . . has failed to comply with any requirement," (2) "attempt[ing] to resolve the noncompliance through conciliation", and (3) if noncompliance is not resolved, submitting written findings and recommendations to the BOE. The *Accardi* Doctrine, as adopted in Maryland, requires administrative agencies to follow their own rules, regulations, and procedures. *See Pollock v.*

*Patuxent Inst. Bd. of Review*, 823 A.2d 626 (Md. 2003). However, "the complainant . . . must . . . show that prejudice to him or her (or it) resulted from the violation in order for the agency decision to be struck down." *Id.* at 650–51.

The parties do not fully brief whether the BOE is an administrative agency subject to the *Accardi* Doctrine, or whether a BOE action can be invalidated because of the MWBOO's failure to abide by certain requirements. Regardless, even if applicable, the *Accardi* Doctrine does not invalidate the BOE's decision. First, although the City does not point to any specific communication where it explicitly told JDM that it had cause to believe that JDM failed to comply with the M/WBE requirements, the repeated communications from the MWBOO about JDM's inability to finalize the subcontracts amounted to notification that the MWBOO believed JDM was failing to comply. Second, the MWBOO attempted in good faith to resolve noncompliance through conciliation: it extended JDM's deadline for compliance, sought to understand the obstacles to finalizing the subcontracts, and communicated with JDM about satisfying the M/WBE requirements. Lastly, although the City does not point to any evidence that the MWBOO submitted written findings and recommendations directly to the BOE, JDM has failed to prove that it was prejudiced by this failure. The MWBOO explained its recommendation to the DPW in a written memorandum and to the BOE in live testimony, the DPW explained its recommendation in writing to the BOE, and JDM was well aware of the position of both the MWBOO and the DPW prior to the BOE hearing.

V.

In its first counterclaim, the City sued JDM for breach of contract. This counterclaim seems to have been originally intended to allege that JDM breached Contract 839R, even though

the City now denies the legal force of that contract. (*See* Def.'s Am. Answer, Aff. Defenses, and Counter Claims ¶ 88.) Possibly because of that tension, the City did not expressly move for summary judgment on this counterclaim, although its arguments implicitly suggest summary judgment is appropriate. Although JDM also failed to expressly move for summary judgment here, in its opposition/reply JDM "seeks dismissal" of this counterclaim because the City inappropriately terminated Contract 839R, JDM did not breach Contract 839R, and the City cannot establish damages.

"[I]n order to state a claim for breach of contract, a plaintiff need only allege the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation by the defendant." *RRC Ne., LLC v. BAA Maryland, Inc.*, 994 A.2d 430 (Md. 2010) (citing *Taylor,* 776 A.2d at 651). "It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages." *Taylor*, 776 A.2d at 651 (citations omitted). If the non-breaching party does seek damages upon proof of liability, it "may recover . . . for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty." *Thomas v. Capital Med. Mgmt. Assoc., LLC*, 985 A.2d 51, 66 (Md. Ct. Spec. App. 2009) (citations and marks omitted).

JDM breached its contractual obligation to comply with the M/WBE requirements. *See supra* Section III.  However, the City has not proved, nor really attempted to prove, that it suffered damages as a result of this breach. Consequently, I will grant summary judgment in the City's favor on this counterclaim, but I will award only nominal damages of one dollar.[15]

---

[15] At the hearing, the City suggested that these motions were limited to addressing the issue of liability, not damages. I see no indication in the docket, however, of such a limitation.

VI.

The City's second counterclaim seeks $817,125.18 in liquidated damages—that is,

JDM's bid bond—for breach of contract because "JDM failed to comply with the terms of its Bid

Contract to fulfill all of the conditions precedent to enter a Performance Contract with the City

within 30 days of the award . . . ." JDM, on the other hand, argues that it was only required to

execute Contract 839R and furnish the City with the required documentation and performance

bond to get its bid bond back. JDM asserts that the performance bond, not the bid bond, secured

its obligation to perform under Contract 839R.

Under the Maryland *state* public contract regulations and law, a bid bond:

> is designed to assure only that a bidder, if successful, will, in fact, enter into the
> contract he has bid upon, and to provide a secure fund to compensate the State if
> he fails to do so. . . . Its function and its legal effect end once a contract is
> signed, for at that point the condition of the bond has been satisfied.

*Kennedy Temporaries v. Comptroller of the Treasury*, 468 A.2d 1026, 1033–34 (Md. Ct. Spec.

App. 1984) (quoting MD. CODE REGS. 21.06.07.03) (internal marks and other citations omitted).

Similarly, under the Baltimore City charter:

> Any successful bidder who fails to execute promptly and properly the required
> contract, performance bond, irrevocable letter of credit, or certification, as
> applicable, shall forfeit the amount deposited, or an equivalent amount under the
> bid bond. . . . On execution of the contract and bond by the successful bidder,
> the bid checks shall be returned to all bidders, or the equivalent amounts charged
> against their bid bond shall be released.

BALTIMORE CITY CHARTER, Art. VI, § 11(g)(3)–(4). The Bid Bond Document here required

returning the bid to JDM if (1) its bid was rejected, or (2) its bid was accepted and JDM

"execute[d] and deliver[ed] a Contract . . . (properly completed in accordance with said Bid), . . .

furnish[ed] a bond for his faithful performance of said Contract . . . and . . . in all other respects

perform[ed] the Agreement created by the acceptance of said bid." (Def.'s Mot., Ex. 7 at BB-1.)

23

JDM, as the successful bidder, complied with all these terms in the Bid Bond Document. After receiving the award, JDM properly executed and delivered the contract, furnished the performance bond, and otherwise performed all post-award, pre-formal contract execution instructions included in Contract 839R. Once JDM did so, the performance bond, not the bid bond, became the City's protection. Although SC-8 provided for bid bond forfeiture if the award was annulled, that provision only discussed annulment for failure to meet certain post-award, pre-execution conditions which JDM in fact satisfied. Consequently, the City is not entitled to the bid bond and summary judgment will be granted in JDM's favor on this counterclaim.

VII.

In its third counterclaim, the City seeks damages for its detrimental reliance on JDM's promise that it had reached agreements with the necessary M/WBE subcontractors. The City does not appear to have moved for summary judgment on, or even mentioned, this promissory estoppel claim in its motion or reply. Although JDM also failed to formally move for summary judgment on this counterclaim, in its opposition/reply it argues that this counterclaim should be dismissed.

"Once it is established, either by an admission of a party or by a judicial finding, that there is in fact an enforceable contract between the parties . . . then a party may no longer recover under the theory of promissory estoppel." Francis C. Amendola, et al., 28 AM. JUR. 2D ESTOPPEL AND WAIVER § 57 (citing *World Championship Wrestling, Inc. v. GJS Intern., Inc.*, 13 F. Supp. 2d 725 (N.D. Ill. 1998)); *accord Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 934 (8th Cir. 1999) (citing to courts in multiple jurisdictions and noting "the widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract"); *cf. Pavel Enterprises, Inc. v. A.S. Johnson Co., Inc.*, 674 521, 534 (Md. 1996) ("[T]here are

different ways to prove that a contractual relationship exists between a general contractor and its subcontractors. Traditional bilateral contract theory is one. Detrimental reliance can be another.").

Because I have found that an enforceable contract, Contract 839R, existed between JDM and the City, the City's promissory estoppel claim will be dismissed as moot. *Shandong Airlines Co., Ltd. v. Capt LLC*, 650 F. Supp. 2d 1202, 1207 (M.D. Fla. 20009) ("[B]ecause relief on these quasi-contract claims cannot be granted once a breach of contract has been established, the Court cannot enter relief based these claims. Accordingly, for purposes of granting this motion, Shandong's promissory estoppel claim . . . [is] regarded as moot." (internal citations omitted)); *Jones*, 180 F.3d at 934 ("[T]he jury necessarily found that an enforceable contract between the parties existed. This finding moots the issue of whether, in the absence of an enforceable contract, Lennox may have been liable to A/C under a theory of promissory estoppel.").

DATE: July 26, 2010                       _____/s/_____

                                          J. Frederick Motz
                                          United States District Judge